# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ANTWAN SLATER,

        Plaintiff,

    v.                                                    Case No. 07-C-841

JEANANNE GREENWOOD and
RICHARD HEIDORN, MD,

        Defendants.

---

## DECISION AND ORDER

---

Plaintiff Antwan Slater, an inmate incarcerated by the Wisconsin Department of Corrections ("DOC") at the Green Bay Correctional Institute ("GBCI"), brought this *pro se* civil rights action against two DOC employees, Jeananne Greenwood and Richard Heidorn, M.D. (collectively, "Defendants"), claiming they denied him adequate medical treatment in violation of 42 U.S.C. § 1983. Slater seeks compensatory and punitive damages, as well as a declaratory judgment against the Defendants, for their alleged violation of his Eighth Amendment protections against cruel and unusual punishment. Slater claims that both Greenwood, the Director of the Health Services Unit ("HSU") at the GBCI, and Dr. Heidorn, a physician at the GBCI, were deliberately indifferent to his requests for medical treatment. Defendants have now moved for summary judgment on the merits, and also have raised an affirmative defense of qualified immunity. Though Defendants' qualified immunity defense fails, their motion for summary judgment will be granted and this action dismissed.

## I. Summary Judgment Standard

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a *genuine* issue of *material* fact for the case to survive. *Id.* at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). The nonmoving party must "set out specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted).

## II. Facts

Heidorn is an employee of the Wisconsin DOC who works at the GBCI as a physician. (DPFOF ¶ 3.) As the physician, Heidorn attends to the medical needs of inmates, diagnoses and treats illness and injuries and arranges for professional consultation when warranted. (DPFOF ¶ 4.) He also assists in supervising the development and implementation of treatment protocols and patient flow charts. (*Id.*)

2

Greenwood is an employee of the Wisconsin DOC who works at the GBCI as the Manager of the HSU. (DPFOF ¶ 5.) As the HSU Manager, Greenwood manages and supervises the health services provided at the GBCI, develops procedures, monitors care plans, prepares required reports, monitors nursing practice documentation in medical records, provides liaison activities to other disciplines, institution units, and community health care providers, and generally provides the overall administrative support and direction of the HSU. (DPFOF ¶ 6.) She also works with the primary care physician, dentist, psychiatrist, and specialists serving as consultants to the Bureau of Health Services ("BHS") in a collaborative manner to provide quality health care at the assigned correctional facility in an efficient and effective manner. (*Id.*) Greenwood has considerable latitude for independent action within established DOC/BHS standards, policies, and procedures. (*Id.*)

The procedure for inmate access to health services within the HSU dictates that an inmate may submit a Health Services Request ("HSR") to the HSU (DPFOF ¶ 10), and the inmate may check a box on the HSR form if the inmate wishes to see the HSU staff (DPFOF ¶ 11). In a situation where the inmate feels a need to be seen by health services immediately, he may contact his housing unit officer or work supervisor, who will then notify the HSU nursing staff, and the nursing staff will then determine if an urgent sick call appointment is necessary. (DPFOF ¶ 12.) If such an appointment is scheduled, a nurse will see the inmate and evaluate his condition to determine if he should be seen by a doctor. (*Id.*)

Slater is an inmate incarcerated by the Wisconsin DOC at the GBCI at all times relevant to this action. (PPFOF ¶ 1.) On April 2, 2007, he submitted an HSR, asking to be seen for a lump under his eye. (PPFOF ¶ 2; DPFOF ¶ 13.) On April 9, 2007, nurse Kathy Lemens saw Slater (PPFOF ¶ 3), and noted the lump under his left eye. (DPFOF ¶ 14.) Slater informed the nurse that

3

the he had the lump for about a month, and that it did not cause him pain. (*Id.*) Nurse Lemens

noted the absence of drainage, open areas, tenderness, and other visual problems. (*Id.*) At this time,

the lump was "pea size[d]," and only affected his left eye. (PPFOF ¶ 4.) Nurse Lemens instructed

Slater to apply warm compresses to the eye, and scheduled an appointment for Slater with Heidorn

for April 13, 2007. (Pl.'s Ex. A at 1003; DPFOF ¶ 14.) When Slater did not see Heidorn during

his appointed time on April 13, 2007, no follow-up occurred as his condition was not considered

urgent, though his appointment was rescheduled. (DPFOF ¶ 15.)

On either April 24 or 25, 2007, Heidorn saw Slater and examined his eye. The two sides

disagree as to the facts leading up to that examination, as well as the specific day on which it

occurred. Slater claims to have written to HSU, but no action was taken between April 9 and April

24 or 25. (PPFOF ¶ 6.)[1] Slater alleges that a guard commented about the lump on April 24, 2007,

noted that it deserved medical attention, and ordered another guard to call HSU about the matter.

(PPFOF ¶ 7.) Within four hours of the guard's phone call to HSU, Slater says he saw Heidorn.

(PPFOF ¶ 8.) The Defendants, however, allege that Slater filed another HSR on April 24, 2007

(DPFOF ¶ 16), and that Heidorn examined Slater on April 25 for that reason (DPFOF ¶ 17). Under

either set of facts, when Heidorn examined Slater, he diagnosed Slater with a bi-lateral sty, and

prescribed Cipro Ophthalmic eye drops, and Cipro pills, as treatment. (*Id.*)

On May 4, 2007, Slater submitted an HSR request because he had used all his prescribed

medication and sought something stronger for the pain he experienced. (DPFOF ¶ 18.) Two days

later he was informed of an appointment to see Heidorn (DPFOF ¶ 19), and at his May 14

appointment, Heidorn told Slater of his intention to submit a request for authorization to allow

---

[1] Slater, however, notes that this time that elapsed between seeing nurse Lemens and seeing Dr. Heidorn was "almost a month."

Slater to see an off-site ophthalmologist for the condition (DPFOF ¶ 20). Heidorn completed the request on May 17 (DPFOF ¶ 20), and BHS denied the request that same day because BHS thought the appropriate next step would be to have the in-house Optometrist examine Slater when he was next at the GBCI on June 29, 2007 (DPFOF ¶ 21). On May 31, 2007, Heidorn spoke to Greenwood about Slater's condition and situation. (DPFOF ¶ 22.) They decided to classify Slater's condition as a Class II urgent case, which resulted in an appointment for Slater at the Green Bay Eye Clinic on June 4, 2007, at the first available appointment. (*Id.*)

At the Green Bay Eye Clinic appointment, Slater was diagnosed with Chalazion, which is a chronic inflammation of the melibomian gland, in both eyes, and had surgery that same day. (DPFOF ¶ 23.) If the condition still lingered after a month, the Green Bay Eye Clinic directed that Slater should follow-up. (*Id.*) Heidorn saw Slater on June 5, June 12, and June 25, and noted that while his condition was improving, it was not entirely resolved. (DPFOF ¶ 24.) The same was true when Heidorn saw Slater on July 24, 2007, so Heidorn ordered that a follow-up appointment be scheduled for Slater at the Green Bay Eye Clinic. (DPFOF ¶ 25.)

No action was taken with regard to follow-up appointments for the unresolved Chalazion for over two months, until Greenwood notified Heidorn on November 9, 2007, that the order had never been scheduled. (DPFOF ¶ 26.) Greenwood reviewed Slater's medical record on that day, and noted that the appointment at the Green Bay Eye Clinic had not been scheduled because Heidorn's July 24 order was overlooked by someone in the HSU. (Greenwood Aff. ¶ 13.) In the time between July 24 and November 9, 2007, Heidorn had seen Slater for other unrelated health problems, and he claims Slater never mentioned anything at those times that he was experiencing increased vision problems or any other increased symptoms related to his eyes. (DPFOF ¶ 28.)

However, Slater claims he experienced blurriness and other vision problems, as well as pain, discomfort, mental and emotional stress, and humiliation over his condition during that same period of time. (PPFOF ¶¶10, 12.)

On November 9, 2007, the day Greenwood told him of the lack of a follow-up appointment for Slater, Heidorn called Slater in for an examination, noted that some residual of the infection, and again ordered a follow-up appointment with the Green Bay Eye Clinic. (DPFOF ¶ 26.) Slater's follow-up occurred on November 21, 2007, and the doctors there recommended outpatient surgery to treat the remaining infection. (DPFOF ¶ 27.) As of December 10, 2007, Heidorn was waiting to hear back from the clinic as to Slater's scheduled appointment for this outpatient surgery. (*Id.*) Though Greenwood was involved with making some of the decisions relevant to Slater's treatment, she never personally examined him relative to his medical condition. (DPFOF ¶ 29.)

In Defendants' Answer to Slater's Complaint, Greenwood and Heidorn denied acting with deliberate indifference to Slater's medical needs, as well as any involvement in violating Slater's Eighth Amendment rights. (Answer at 1.) Additionally, they asked the court to dismiss the action. (*Id.*) Greenwood and Heidorn did not assert any affirmative defenses, including qualified immunity, in their Answer.

**III. Analysis**

A claim can be filed under section 1983 "for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' by any person acting 'under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory.'" *Gomez*, 446 U.S. at 638 (citing 42 U.S.C. § 1983). Then, in order for a plaintiff to succeed in a section 1983 claim, the plaintiff must (1) "allege that some person has deprived him of a federal right," and (2) "allege that the

person who has deprived him of that right acted under color of state or territorial law." *Gomez*, 446 U.S. at 640. A violation of a Constitutional right qualifies as such a deprivation of a federal right. *See Williams v. Liefer*, 491 F.3d 710, 714 (7th Cir. 2007).

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII; *Williams*, 491 F.3d at 714. In addition to prohibiting prison staff from affirmatively inflicting such punishment on inmates, the Eighth Amendment forbids staff from knowingly withholding medical treatment necessary to the inmate's health or from being deliberately indifferent to the need for such treatment. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). In order to establish deliberate indifference, the plaintiff needs to show (1) that he had an objectively serious medical condition and, (2) that prison officials knew of a risk posed by the condition and disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 834-837 (1994). At the summary judgment stage, this means the plaintiff must place into evidence some facts from which a jury could – if the case were to go to trial – draw the conclusion that the defendants were deliberately indifferent.

"[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Farmer*, 511 U.S. at 835. With regard to the medical needs of incarcerated individuals, deliberate indifference "constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Gamble*, 429 U.S. at 104. "[A]n inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Id.* at 105-06. Negligent treatment or diagnosis by a physician, or other medical malpractice, does not become a constitutional violation merely because the victim is a prisoner who is afforded Eighth Amendment protections. *Id.* at 106. Where prison officials delay an inmate's medical treatment, but do not deny him medical treatment, the inmate "must offer

7

medical evidence that tends to confirm or corroborate a claim that the delay was detrimental."
*Williams*, 491 F.3d at 714-15.

Even assuming that the Slater's eye condition was an objectively serious medical condition, he cannot allege facts sufficient to permit a reasonable fact-finder to find that either Greenwood or Heidorn were deliberately indifferent to that condition. The only possible evidence Slater can produce is evidence of delays in treatment. The first delay he experienced was the appointment with Heidorn that he failed to attend on April 13, 2007. (DPFOF ¶ 14.) The next delay lasted only about three weeks, between an examination by Heidorn on May 14 (DPFOF ¶ 20), and an examination at the Green Bay Eye Clinic on June 4 (DPFOF ¶ 23). This delay, though relatively short, even included the time it took for BHS to deny Heidorn's first request for a specialist evaluation (DPFOF ¶ 21), as well as the time it took for Greenwood and Heidorn to collaborate on an alternative solution (DPFOF ¶ 22). The third delay in treatment of the eye condition lasted from July 24 to November 9. (DPFOF ¶ 26.)

The only evidence Slater can provide in support of deliberate indifference were the delays in treatment, which fall short of "unnecessary and wanton infliction of pain." He would have to prove that his condition worsened as a result of the delays, and he cannot do so. The only evidence that his condition *may* have worsened is his statement to that effect (See PPFOF ¶¶ 10, 12). In the end, it seems that he disagrees with his course of treatment, or wanted speedier treatment, but such delays in treatment are also experienced by those who are not incarcerated, to whom the Eighth Amendment does not currently apply. Deliberate indifference requires more than simple negligence,[2] and with the exception of a few delays (which are common *outside* of the prison

---

[2] Slater might have a state law claim to negligence on the basis of the delay in treatment between July 24 and November 9, 2007.

8

context), Slater can produce no evidence that either Greenwood or Heidorn ever acted out of anything but concern for Slater and his medical condition. Therefore, I grant summary judgment to Greenwood and Heidorn on Slater's section 1983 claim. Having found no constitutional violation, I need not address the Defendants' qualified immunity arguments.

**IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment is **GRANTED** and the Plaintiff's claim is dismissed.

Dated this ___9th___ day of June, 2008.

s/ William C. Griesbach
William C. Griesbach
United States District Judge